```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/08
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :   INFORMATION
            - v. -                        :
                                          :   08 CRIM 1135
DAVID LEE,                                :
                                          :
            Defendant.                    :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### COUNT ONE

(Conspiracy To Commit Wire Fraud And To Make False Bank Entries)

The United States Attorney charges:

#### RELEVANT PERSONS AND ENTITIES

1.  At all relevant times, Bank of Montreal ("BMO") was a bank with its principal place of business in Toronto, Canada. BMO operated a wholly-owned subsidiary called BMO Capital Markets Corporation. A division within BMO Capital Markets Corporation called the Commodities Derivatives Group (hereinafter "the Commodities Group") was based in Manhattan and engaged in the business of trading instruments that derived their value from the market price of various underlying commodities, including natural gas.

2.  At all relevant times, DAVID LEE, the defendant, worked in the Commodities Group as BMO's lead natural gas options trader. LEE's annual compensation included a base salary, a bonus based primarily on the profitability of the Commodities Group's trading activities, and long-term incentive compensation

based primarily on LEE's individual productivity.  At all relevant times, most of LEE's compensation consisted of bonus payments.

3.   At all relevant times, Optionable Inc. ("Optionable") was a commodities brokerage firm with a focus on natural gas and other energy derivatives.  Optionable's principal place of business was in Westchester County, New York.

4.   At all relevant times, a co-conspirator not named as a defendant herein ("CC-1") was affiliated with Optionable either as an officer or a consultant.

BMO'S VALUATION PROCEDURE

5.   At all relevant times, BMO required traders in the Commodities Group to assign the fair market value to each open financial position in the trader's portfolio, which was also known as a "book."  This process was known as "marking the book," and the value assigned to each position was a "mark."  BMO used these marks, among other things, to value the trading positions of the Commodities Group, to determine the daily profit and/or loss for the Commodities Group, and to assess BMO's risk exposure related to the Commodities Group's trading positions.

6.   Through a process called "independent price verification," BMO sought to verify the accuracy of the marks that Commodities Group traders assigned to their positions by comparing those marks to independent market quotes for similar positions.

2

7.  In or about 2001, DAVID LEE, the defendant, became BMO's lead natural gas options trader.  In connection with BMO's "independent price verification" process, LEE was required to mark the positions in BMO's natural gas options book (hereinafter "LEE's Positions") on a daily basis by assigning the fair market value to each position.  Because many of LEE's Positions were not widely traded on a public exchange, pricing information for comparable positions was not readily ascertainable to BMO based on public data.  Accordingly, as part of its independent price verification of LEE's marks, BMO compared LEE's marks to price quotes for similar positions that BMO obtained from third-party brokerage firms, which presented these quotes to BMO as independent and as accurately reflecting market prices.  At all relevant times, BMO's price verification personnel usually compared LEE's marks to price quotes obtained from only one brokerage firm: Optionable.

## THE SCHEME TO DEFRAUD

### DAVID LEE Mismarks His Book

8.  In or about May 2003, DAVID LEE, the defendant, began mismarking his natural gas options book by overstating the fair market value of some of LEE's Positions.  Between in or about 2003 and in or about 2006, LEE's inflated marks led BMO to believe that LEE's Positions were largely profitable, when in truth and in fact, many of them were not profitable.  As a

result, BMO gave LEE greater trading authority, which enabled LEE to substantially increase the number of positions in BMO's natural gas options book.

9. DAVID LEE, the defendant, began mismarking LEE's Positions in 2003 in an effort to enhance his apparent job performance and thus his bonus compensation. From 2003 to 2006, LEE's compensation increased from approximately $722,000 to approximately $5.35 million.

10. By in or about 2006, however, changes in the natural gas market caused a sharp decline in the value of LEE's Positions. In response, DAVID LEE stepped up his mismarking in order to maximize his profitable positions and minimize his losing positions. Through this mismarking, LEE made his natural gas book appear materially more valuable than it was.

### CC-1 Helps LEE Conceal His Inflated Marks

11. At all relevant times, DAVID LEE, the defendant, engaged in a scheme with CC-1 to deceive BMO's price verification personnel into believing that LEE's inflated marks accurately reflected the fair market value of LEE's Positions. To carry out this scheme, LEE sent CC-1 price quotes for LEE's Positions that matched LEE's inflated marks to Optionable and CC-1 instructed Optionable brokers to return -- or regurgitate -- LEE's self-serving quotes to BMO's price verification personnel as if they were Optionable's accurate view of prevailing market prices for

4

LEE's Positions and independent of LEE. At all times, as CC-1 knew, BMO was using this pricing information from Optionable to evaluate the accuracy of LEE's marks while under the impression that it was accurate and independent of LEE.

### The Use Of "Round Trips"

12. As part of this scheme, beginning in or about 2003, DAVID LEE, the defendant, and CC-1 agreed that LEE would send pricing information that was consistent with his marks to Optionable brokers twice each month and that Optionable brokers then would return that information -- virtually unchanged -- on a "round-trip" or "u-turn" to BMO's price verification personnel, without disclosing to BMO that this information originated with LEE himself. Consistent with this agreement between LEE and CC-1, Optionable personnel routinely received pricing information from LEE and regurgitated it in reports sent by interstate email to BMO's independent price verification and market risk personnel without disclosing its source.

13. To carry out this scheme, at various times relevant to this Information, at the end of each month, DAVID LEE also sent pricing information for LEE's Positions to CC-1 by telephone calls and instant messages and then CC-1 returned this information -- virtually unchanged -- to LEE by instant messages, knowing full well that LEE would submit it to BMO's market risk personnel. CC-1 prepared the instant messages that

he sent to LEE in a way that made them appear to reflect actual offers to trade from willing, able, and independent natural gas options traders when, in truth and fact, as CC-1 knew full well, these instant messages merely regurgitated LEE's own pricing information.

### The Use Of "RealMarks"

14.   In or about September 2006, BMO's independent price verification and market risk personnel discussed whether to begin verifying DAVID LEE's marks by comparing them to pricing information from a so-called multi-contributor pricing service (the "Multi-Contributor Service") instead of by comparing them to pricing information from Optionable. The Multi-Contributor Service reported pricing information that it collected and aggregated from multiple independent natural gas traders.

15.   Concerned that BMO's use of the Multi-Contributor Service pricing information would lead BMO to discover that he had been overvaluing his book, DAVID LEE, the defendant, consulted with CC-1.  CC-1 came up with the idea of providing BMO's independent price verification and market risk personnel with pricing information for LEE's Positions under the guise of a new pricing service introduced by Optionable. This new service was called "RealMarks" and, less frequently, "OPEX Analytics."

16.   RealMarks appeared as a grid with specific trading positions in one column and corresponding market quotes in other

columns. Optionable publicly described RealMarks as providing "up-to-date, reliable information as to the real-time market valuations of options" and as "an invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

17. From in or about September 2006 through and including in or about March 2007, at the end of the month, DAVID LEE, the defendant, filled out RealMarks grids with false pricing information for some of LEE's Positions that concealed losses associated with those positions. Using his personal email account from his home in New Jersey, LEE sent these completed grids to CC-1 in Westchester County, New York. CC-1 instructed an Optionable employee to return these grids to BMO with LEE's own pricing information without disclosing that, as CC-1 knew, the pricing information reflected on the RealMarks grids originated with LEE himself.

THE SCHEME UNRAVELS

18. In or about October 2006, BMO's independent price verification and market risk personnel started comparing the pricing information contained in Optionable's RealMarks grids with information from the Multi-Contributor Service. The information from the Multi-Contributor Service indicated that DAVID LEE's natural gas book was overvalued by tens of millions of dollars.

19. In or about February 2007, BMO hired an outside

7

consultant to assess BMO's independent price verification process. In the meantime, the difference in the value of LEE's Positions based on pricing data from the Multi-Contributor Service and from Optionable's RealMarks service continued to grow by millions of dollars. Around the same time, BMO began to liquidate some of LEE's Positions at a loss out of a concern that DAVID LEE's book had grown too large.

20. On or about April 27, 2007, before the stock market opened in the United States, BMO publicly announced for the first time that it had sustained millions of dollars in commodities trading losses, which included losses attributable to LEE's Trading Positions. On or about May 8, 2007, BMO publicly announced that it had suspended its business relationship with Optionable.

21. On or about May 16, 2007, DAVID LEE's employment at BMO ended.

22. On or about May 17, 2007, BMO publicly announced that it had experienced commodities trading losses of approximately C$680 million. In its annual report for 2007, BMO reported that it had experienced commodities trading losses of approximately C$853 million.

## Statutory Allegations

23. From in or about May 2003 through and including in or about April 2007, in the Southern District of New York and

elsewhere, DAVID LEE, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; and (2) making false bank entries, in violation of Title 18, United States Code, Section 1005.

24.  It was a part and an object of the conspiracy that DAVID LEE, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writing, signs, pictures, signals, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

25.  It was a further part and object of the conspiracy that DAVID LEE, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, would and did make a false entry in any book, report, or statement of a branch of a foreign bank (Bank of Montreal) with intent to injure or defraud such branch or to deceive any officer of such branch or any agent or

examiner appointed to examiner the affairs of such bank, in violation of Title 18, United States Code, Section 1005.

## Overt Acts

26.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  On or about May 30, 2003, at approximately 11:04 a.m., DAVID LEE, the defendant, sent an email to an Optionable employee that provided pricing information relating to LEE's Positions.

b.  On or about May 30, 2003, at approximately 4:28 p.m., CC-1 directed an Optionable employee to send an interstate email to BMO's independent price verification and market risk personnel containing the exact same pricing information that LEE had sent to the Optionable employee earlier that same day but did not inform BMO that the pricing information came directly from LEE.

c.  On or about December 29, 2004 at approximately 2:41 p.m., LEE sent an instant message to CC-1 that contained pricing information relating to LEE's Positions.

d.  On or about December 29, 2004, at approximately 3:32 p.m., LEE sent an instant message to an Optionable employee that contained false pricing information relating to LEE's

Positions.

e. On or about December 29, 2004, at approximately 3:39 p.m., CC-1 had an Optionable employee send an interstate email to BMO's price verification and market risk personnel containing the exact same pricing information that Optionable had received from LEE earlier that same day, without informing BMO that the pricing information came directly from LEE.

f. On or about June 29, 2006, at approximately 11:03 a.m., LEE spoke with CC-1 by telephone about sending pricing information to BMO's price verification and market risk personnel.

g. On or about October 31, 2006, LEE had a telephone conversation with CC-1 about CC-1 wanting to speak on an unrecorded phone line in order to avoid being recorded as they discussed RealMarks reports that contained false information.

h. On or about January 30, 2007, LEE sent a blank RealMarks grid from his BMO email account while in Manhattan to his personal email account in New Jersey.

i. On or about March 30, 2007, at approximately 5:17 p.m., LEE had a telephone conversation with CC-1 about Optionable personnel having mistakenly sent pricing information to BMO's price verification and market risk personnel without having first

obtained LEE's approval of the information contained in the report.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Wire Fraud)

The United States Attorney further charges:

27. The allegations set forth in paragraphs 1 through 22 and 26 are repeated and realleged as if set forth fully herein.

28. On or about January 30, 2007, in the Southern District of New York and elsewhere, DAVID LEE, the defendant, unlawfully, wilfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to deceive the Bank of Montreal with LEE's pricing information disguised in the RealMarks grid, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice, to wit, an email containing a blank RealMarks grid from New York, New York to New Jersey.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

(False Statements To A Bank)

The United States Attorney further charges:

29. The allegations set forth in paragraphs 1 through 22 and 26 are repeated and realleged as if set forth fully herein.

30. From in or about September 2006 through and including in or about April 2007, in the Southern District of New York and elsewhere, DAVID LEE, the defendant, unlawfully, willfully, and knowingly, would and did make a false entry in any book, report, or statement of a branch of a foreign bank (Bank of Montreal) with intent to injure or defraud such branch or to deceive any officer of such branch, to wit, LEE mismarked his natural gas book by providing BMO with inflated values for some of LEE's Positions.

(Title 18, United States Code, Sections 1005 and 2.)

## COUNT FOUR

(Obstruction of Justice)

The United States Attorney further charges:

31. The allegations set forth in paragraphs 1 through 2 are repeated and realleged as if set forth fully herein.

32. On or about April 27, 2007, after BMO publicly announced that it had sustained millions of dollars in commodities trading losses, the United States Commodity Futures Trading Commission ("CFTC") issued a written request to BMO Capital Markets Corporation in New York, New York asking it to

preserve all records relating to BMO's natural gas trading activities.

33. On or about April 27, 2007, after learning of this preservation request from the CFTC, DAVID LEE, the defendant, deleted a blank RealMarks grid and other records relating to his mismarking scheme from a laptop computer.

34. On or about April 27, 2007, DAVID LEE, the defendant, unlawfully, willfully and knowingly, would and did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit, a regulatory investigation being conducted by the CFTC.

(Title 18, United States Code, Section 1505.)

### FORFEITURE ALLEGATION

35. As the result of committing one or more of the offenses alleged in Counts One through Three herein, defendant DAVID LEE shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

### Substitute Asset Provision

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (1) cannot be located upon the exercise of due diligence;

      (2) has been transferred or sold to, or deposited with, a third person;

      (3) has been placed beyond the jurisdiction of the Court;

      (4) has been substantially diminished in value; or

      (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

  (Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461.)

*Michael J. Garcia*
MICHAEL J. GARCIA
United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DAVID LEE,

Defendant.

INFORMATION

08 Cr. ___

MICHAEL J. GARCIA
United States Attorney.

11/13/08  Defendant present with attorneys Walsh and Keble. AUSA's Golden & Rosen present. Defendant's first appearance. Deft. is advised of his rights. The Defendant is arraigned & enters plea of guilty. Allocution conducted. Court accepts plea. PSR is ordered, sentence is set for 5/13/09 at 4PM. Gov't request for the information to be filed on 11/20/08 is granted (to be filed in one week). The Δ's bail is continued (ROR).

Patterson, J.